**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**RONALD WILKERSON**                                                        **PLAINTIFF**

**VS.**                                                 **CIVIL ACTION NO. 4:03CV285LN**

**TWJANNA TORGERSON; DENNIS JOHNSON,**
**Lt.; CLARK PUCKETT; LAWRENCE GREER;**
**ROBERT JOHNSON; CHRISTOPHER EPPS;**
**JUSTIN HALL; RON WILLIAMS; LARRY**
**HARDY, AARON JAGERS, FREDERICK L.**
**COLE and GLENN JOHNSON**                                              **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter came on for a bench trial before the undersigned United States Magistrate Judge on January 23, 2006. The Plaintiff, Ronald Wilkerson, who is an inmate at the East Mississippi Correctional Facility, appeared *pro se*, and the Defendants were represented by attorneys Joshua C. McCrory and John Clay. Wilkerson's claims are based on the medical care he has received at EMCF. Jurisdiction of this case is based upon 42 U.S.C. § 1983. During the Omnibus Hearing held on April 12, 2004, the parties executed a Consent to Exercise of Jurisdiction by a Magistrate Judge, and, on April 15, 2004, District Judge Tom S. Lee referred this matter to the undersigned, pursuant to 28 U.S.C. 636 (c)(4) and Fed. R. Civ. P. 73(d), for all further proceedings and the entry of judgment. For the reasons that follow, the court is of the opinion that the claims against Twjanna Torgerson, Lt. Dennis Johnson, Robert Johnson, Christopher Epps, Clark Puckett, Justin Hall, Ron Williams, Larry Hardy, Frederick L. Cole and William Ready should be dismissed. However, the court is further of the opinion that Wilkerson has proved a denial of medical care in violation of the Eighth Amendment with regard to the other Defendants and that he is entitled to a judgment against them.

Wilkerson is serving a twenty year sentence for armed robbery, for which he had served, at the time of trial, approximately nine years. He claims that he has been improperly treated at EMCF with regard to the 1975 service-related amputation of his left leg, necessitated by an injury he received while on active duty with the United States Army in Vietnam. During the relevant times for this case, Dr. Frederick Cole was the local physician employed by Wackenhut Correctional Corporation to treat patients at EMCF, Twjanna Torgerson was the Health Services Administrator, Clark Puckett was its business manager, and Dr. Glenn Johnson was the medical director for Wackenhut. When Wilkerson entered EMCF, which is located in Meridian, Mississippi, Aaron Jagers was the Warden of the facility. He has since left that employment and could not be located for service of process in this matter. Lawrence Greer became Warden after Jagers's departure.

On March 20, 2001, Wilkerson reported to EMCF's medical staff that his "stump hurts beyond bearable." On April 26, 2001, medical personnel at EMCF wrote him a prescription for a course of pain medications, anti-inflammatories, and a muscle relaxer. Wilkerson was reviewed for the possibility of a transfer on May 15, 2001, and the psychologist who interviewed him reported that he was in pain and complaining that treatment had not been timely. The psychologist recommended that Wilkerson not be transferred from EMCF, since he was "stable psychiatrically." Apparently, Wilkerson is from the Meridian area, and his wife of over thirty years lives in that community.

Wilkerson reported the same discomfort and frustration during his quarterly review on May 25. On June 6, 2001, Wilkerson submitted a sick call request, stating that the medication for his legs had run out and he had "unbearable pain." Wilkerson was evaluated by Dr. Cole, who recommended that ice be placed on his knee, followed by a steroid injection. Wilkerson was later

2

placed on 800 mg. of Ibuprofen, but, by June 12, he was still complaining of pain. An appointment was made for him for an evaluation at Rush Hospital. Dr. Gray, an orthopedist at that facility, recommended that surgery be performed to shorten Wilkerson's fibula. The surgery was scheduled, and, up to that point, Wilkerson testified that he had been treated well by everyone involved in that process. However, a note in Wilkerson's file, dated July 24, 2001, states, "Spoke with Francie @ Dr. Gray's office to cancel surgery scheduled July 25, 01, @0700 hours. Per orders of T. Torgerson."

The question of why, and by whom, this surgery was canceled was never satisfactorily answered at trial. EMCF is a privately-run facility, which was operated at the time of these events by Wackenhut Correctional Corporation, and now by Geo Group. Although Torgerson was the Health Service Administrator at EMCF at this time, testimony from her, from Dr. Cole, and from Dr. Johnson all indicated that Torgerson would not have had the authority either to schedule or to cancel Wilkerson's surgery. Instead, the procedure allowed local medical personnel to assess the need for an outside evaluation, which, in Wilkerson's case was the orthopedist who recommended surgery. The recommendation would then be sent to a regional nurse manager or medical director. If there was a question at that level as to the need for the surgery, the nurse manager or medical director would have consulted with Dr. Johnson, who works as an independent contractor for Geo Group, as their chief physican. Johnson has the ultimate authority for approving treatment such as Wilkerson's surgery.

The note in Wilkerson's file canceling his surgery does not appear to have been entered by Torgerson, nor did she make the call to cancel the surgery. Torgerson suggested that the note was made by Ella Burton, a medical records clerk, who was not called as a witness at trial. None of the

3

witnesses remembered who made the decision to cancel the surgery. There was some indication that the surgery might have been canceled because Wilkerson was aware of the date, which is considered a security issue. However, Johnson testified that the local unit should have rescheduled the surgery. The local physician, Dr. Cole, testified that he was waiting for approval from corporate to reschedule the surgery, stating that, in his experience, such things always moved slowly.

Other notes in Wilkerson's file indicate that Wackenhut personnel were attempting during that time to find a less expensive alternative to the surgery at Rush Hospital. Torgerson testified that she did not originally believe that the Department of Veterans Affairs would pay for the surgery. However, at some point, medical personnel at EMCF apparently contacted the Veterans Affairs Medical Center in Jackson to determine whether Wilkerson was eligible for treatment at that facility. On August 2, 2001, about a week after Wilkerson's surgery was canceled, a fax was sent to Dr. Cole from the VA Medical Center, stating that the VA had ceased providing medical treatment to incarcerated veterans a year before. A few days later, on August 8, 2001, Dr. Cole sent a fax to Dr. Johnson that contained the following message, "Mr. Wilkerson is a service-connected BKA LLE. VA will no longer treat incarcerated inmates." Dr. Johnson testified that the first time he saw this document was when he reviewed the Complaint in this case.

In the meantime, Wilkerson's medication was continued. His artificial leg broke, and, after trying to repair it himself, Wilkerson asked for a replacement on September 17, 2001. He stated at that time that he could only get around in a wheelchair. His records indicate that, on September 20, he was again given Tylenol #3. On October 5, 2001, Wilkerson was sent to Jackson, where a cast was made of his stump at Wilson Brace & Limb so that they could make a new artificial leg. Again, however, it appears that cost was an issue. On November 8, 2001, Torgerson wrote the following

4

letter to Warden Jagers of EMCF, which was copied to the Commissioner and Deputy

Commissioner of the Mississippi Department of Correction:

> Inmate Ronald Wilkerson, R4674, was received at East MS. Correctional Facility
> April 28, 1999, and is currently serving a 20-year sentence for bank robbery.
> According to the inmate, he requested transfer to this facility in order to be closer to
> his family, who lives in this area. He is diagnosed with post Traumatic Stress
> Disorder and is seen regularly by the psychiatrist and mental health team. He is also
> assigned to attend anger management groups; however, his attendance has been
> sporadic at best. This inmate has stated numerous times over the last two and a half
> years he is about to lose control, but there is no supporting documentation in the
> record to reflect this has occurred. Lately, he has focused on his physical ailments,
> which include hypertension, insulin dependent diabetes, osteoarthritis and a service-
> connected below the knee amputation of the left leg. The inmate is confined to a
> wheelchair at this point. He has also been provided crutches in the past. In addition,
> the inmate has been sent outside our facility for consultations and been seen several
> times at Wilson Brace and Limb in Jackson, MS, for needed repairs to his artificial
> limb. The most recent quote to repair his prosthesis is $4700 and is not absolutely
> necessary since we have provided him with other assistive devices as mentioned
> above. We have attempted unsuccessfully to secure services for him at the Veteran's
> Administration, but, as you are aware, they no longer provide services to
> incarcerated individuals. Due to his medical condition and the fact that he is stable
> on psychiatric medications, we are recommending that he be transferred to a facility
> that can more appropriately meet his long-term medical needs.

Torgerson testified that she wrote the letter at Jagers's request, in order to inform him of Wilkerson's

situation. Wilkerson was not moved to a different facility, and he testified that he would have

opposed such a move, since he wanted to remain near his family.

Notes from the Mental Health personnel that saw Wilkerson during this time noted that he

was having problems with his leg in October, and, by November 14, 2001, he was confined to a

wheelchair "but adjusting fine." He continued to be seen on a regular basis in the clinic, and, during

a routine visit in December, 2001, voiced no complaints.

On July 8, 2002, the Mental Health Team reviewed Wilkerson's status, and he reported:

> [T]hat because of pain and lack of exercise he is depressed. He stated because of
> failure to repair or replace his prosthesis, he feels hopeless. Mr. Wilkerson stated he
> has been wheelchair bound for many months and now he is losing use of his muscles.

By July 15, Wilkerson was taken to the clinic complaining of swelling in his stump; however, no

swelling was noted by Dr. Cole. He was given another prescription for Naprosyn. On August 8,

Wilkerson was taken to an orthopedist to be fitted for a stump reducer. There was, ultimately, a

delay in getting the reducer to him, but he received it on October 9, 2002.

Wilkerson's wife, Mary Ann Wilkerson, testified at trial that she had numerous

conversations with EMCF personnel about her husband's leg, including Torgerson, who was

"friendly and helpful" to her. On October 7, 2002, Mrs. Wilkerson met with a committee of state

representatives who were discussing care of inmates. Christopher Epps, Commissioner of the

Mississippi Department of Corrections, met with the committee and spoke with Mrs. Wilkerson.

On October 13, 2002, Mrs. Wilkerson sent Commissioner Epps a letter following up on that

meeting. With regard to Wilkerson's leg, she listed the following concerns:

- Upon entering the prison system and when he was transferred to the East
  Mississippi Correctional Facility, Ronald had a functioning prosthetic leg.
  A little over a year ago, the mechanism in the joint of the leg wore out.
  Ronald was transported to Jackson and was fitted with a new prosthesis. The
  old prosthesis was left in Jackson. As of October 13, 2002, he has not
  received a prosthesis.

- During this time, Ronald has been confined to a wheelchair. We realize that
  the prison system is faced with providing adequate care with the minimum
  cost. However, we request that Ronald's case be reevaluated based on the
  following:

  - Continued mobility and exercise is critical to preventing the
    deterioration of the muscles remaining in his injured leg and
    preventing further amputation.

  - One of the most important factors in controlling diabetes is regular
    exercise. Without the prosthetic leg, Ronald is confined to his

> wheelchair or bed 24-hours of every day. If his diabetes is not controlled and managed, it will lead to other issues such as additional amputations, lost vision, and comas. Exercise and proper diet are the most important and cost effective means to manage diabetes.

Commissioner Epps forwarded Mrs. Wilkerson's letter to Larry Greer, who had recently taken the position of Warden of EMCF. In his letter, which was addressed to Mrs. Wilkerson but copied to Warden Greer (with a "suspense date" of 11/20/02), Commissioner Epps stated:

> Thank you for your letter regarding Inmate Wilkerson. I am forwarding your letter to Mr. Larry Greer, Warden at East Mississippi Correctional Facility for response and handling. I am requesting that each area be evaluated and addressed that you mentioned in your letter.

> Additionally, I am requesting Warden Greer to provide you and I a response regarding the medical official's findings on all the concerns that you addressed. Please be patient and allow Warden Greer time to have his medical officials perform the tasks I am requesting. Hopefully, once we receive the evaluations from the qualified medical authorities, this issue can be resolved.

Mrs. Wilkerson did not receive any response from Warden Greer. Greer testified that he had no recollection of receiving the letter. Apparently, he had been assigned to EMCF on October 7, 2002, and, at the time that the letter was written, was in the process of moving from Florida. He admitted that there should have been a secretary or administrative assistant processing his mail at that time. He testified that he also lacked authority to approve medical expenses for inmates.

By November, 2002, Wilkerson complained to Ms. Westbrook, the Mental Health Counselor, that he had been submitting sick call requests regarding his leg for some time. Westbrook contacted the medical staff, who checked the record and reported that there were no such requests. Wilkerson was found guilty of a disciplinary infraction for providing false information. On November 19, and again on January 20, 2003, he was examined by the medical staff, who found that Wilkerson's stump appeared to have good color, but prescribed neurotin, for nerve pain.

On March 10, 2003, Wilkerson submitted another sick call request, and he was seen by Dr. Cole the next day.  Cole diagnosed his condition as peripheral neuropathy, and continued the neurotin prescription.  A week later, Wilkerson reported a "black spot"on his other leg, which was diagnosed as a callous from rubbing against his wheelchair.  Padding for the chair was ordered. Wilkerson continued to have pain both in his left leg and in his right knee, which Dr. Cole diagnosed as degenerative osteoarthritis.  The same degenerative condition was noted in the knee of his amputated left leg. The medical staff continued to treat Wilkerson with ibuprofen.  By March 26, 2003, Wilkerson reported to the psychiatric staff that he was "about to go off" because of the pain and because of the "current war situation."  Wilkerson was questioned at trial about his hostility toward the medical staff, which he admitted, and he stated that it was the result of frustration about the delay in treating his leg.

On April 8, Wilkerson reported that the pain in his stump was getting worse, and he was also suffering back pain because of sitting in the wheelchair.  The medical staff ordered a cushion for Wilkerson's wheel chair.  In May, Wilkerson stated in a sick call request that his stump shrinker was worn out, and he needed a new one to keep his stump from swelling up.  The nurse was advised to check the shrinker for wear and make a recommendation, upon which he was referred to Dr. Cole.

Dr. Cole, who no longer works at EMCF, testified that, during this time, Wilkerson mentioned his stump frequently.  He acknowledged that Wilkerson was not always comfortable in a wheelchair, and Dr. Cole felt like surgery was necessary in order for Wilkerson to wear a prosthesis.  Dr. Cole testified that Wilkerson was suffering from pain, and the medical staff at EMCF dealt with it as best they could, by prescribing pain medication.  However, their ability to prescribe narcotics was limited, as they could only be given for short periods of time.  Dr. Cole further stated

8

that he was also frustrated by the ongoing inaction regarding Wilkerson's surgery.  However, his experience was that delays in treatment at the facility were not uncommon, and were sometimes inordinate.  Cole believed that it was not his place to interfere, as the medical personnel at the corporate level were aware of his recommendation.

From May through July, 2003, Wilkerson's medical records reflect only that he complained of dental problems and a problem with one of his toes.  Apparently, his new prosthesis was ordered during that time, because his medical records indicate that he informed the medical staff on July 15, 2003, that it was ready.  On July 18, Wilkerson signed his Complaint in this case, which was filed in this court on July 23.  On July 20, Wilkerson turned in a sick call request for the pain in his right knee, and he was referred to Dr. Cole.  His record contains the following notation on July 21, regarding his left leg:

> Inmate was told that a leg would be bought for him.  He said it would not do any good unless he had surgery on his leg first.  Nurse Atwood did tell me the leg was going to be bought if he wanted it.

The medical staff gave Wilkerson another prescription for Tylenol #3 on July 25.  Dr. Johnson testified that he saw Wilkerson on August 3 and arranged for his surgery.  However, Wilkerson's medical records show that, on August 21, 2003, Wilkerson was seen by the medical staff for evaluation of his amputated left leg.  His file contains the following note:

> Here for evaluation of left below the knee amputation.  Current prosthesis 6 yr. old.  Complains of stump problems, needing revision.  Review of medical record notes seen by ortho. 2 yrs ago ? Scheduled for revision but not done.  States prosthesis is at B & L in Jackson – not salvageable.

The medical plan at that point was to refer Wilkerson to an orthopedist for evaluation of the need for revision and to address the order for a new prosthesis after the evaluation.  On August 26, Wilkerson told the medical staff that he was expecting to have his surgery for his leg.

9

The revision was performed by Dr. Gray at Rush Hospital on November 11, 2003.  Although he had some later problems, at his omnibus hearing on April 12, 2004, Wilkerson testified that his surgery had been performed and that he had received his prosthesis.  At trial, Wilkerson testified that his pain had been greatly relieved and "everything was going well" with his leg.  He was satisfied with the ultimate result, and there is no indication of permanent injury caused by the delay.  However, Wilkerson believes that he is entitled to recovery for two and one-half years of pain and because EMCF had no desire to fix his problem until after he filed suit.

Section 1983 prohibits the deprivation of constitutional rights under color of state law.  As the United States Supreme Court has taught, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  The amendment's protection extends to prohibit deprivations that are not specifically a part of a prison sentence, but are suffered as the result of imprisonment.  *Id.* at 297, citing *Estelle v. Gamble*, 429 U.S. 97 (1976).  The amendment requires prison officials to provide humane conditions of confinement.  *Farmer v. Brennan*, 511 U.S. 824, 832 (1994).

When a complaint involves conditions that are an element of confinement, as opposed to those that are a part of punishment, an inquiry must be made into the state of mind of the defendant prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 300-302 (1991).  For such a claim to be viable, the official must exhibit "deliberate indifference" to the welfare of the inmate.  *Seiter*, 501 U.S. at 303.  The elements of proof in a case involving conditions of confinement are twofold and include: (1) an objective component, under which the inmate must prove his exposure to a harm or injury that violates contemporaneous standards of decency; and (2) a subjective component, under which the

inmate must prove that the prison authorities' current conduct evidences a deliberate indifference to that exposure. *Helling*, 509 U.S. at 35-36. In other words, under the objective component, the deprivation alleged must be "sufficiently serious," resulting in "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

Deliberate indifference to a prisoner's serious medical needs constitutes an actionable Eight Amendment violation under §1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). However, delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, *which results in substantial harm. Id. Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993), citing *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (delay must constitute "deliberate indifference"). *Estelle v. Gamble* holds that the "unnecessary and wanton infliction of pain" is prohibited by the Eighth Amendment. 427 U.S. at 104. In accordance with that principle, the Fifth Circuit has found that a delay in treatment that causes an inmate to suffer unnecessary pain is considered a harm substantial enough to violate the Eighth Amendment. *Harris v. Hegman*, 198 F.3d 153 (5th Cir. 1999). Thus, in *Harris*, where an inmate alleged that prison officials failed to treat a prisoner's broken jaw for over a week, causing no permanent injury but resulting in the inmate's suffering excruciating pain during that time, he had stated a constitutional claim cognizable under § 1983. *Id*. at 159.

The Fifth Circuit has also held that prisons may undertake a balancing analysis with regard to postponing medical treatment – considering, on one hand, the seriousness of the prisoner's

condition, and, on the other, the availability and expense of providing treatment.  *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. 1981).  However, cost cannot be the only consideration.  Thus, prison officials may not use expense as a rationale for denying medical treatment for serious medical needs.  *Crooks v. Nix*, 872 F.2d 800 (8th Cir. 1989); *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987); *Wilson v. Vannatta*, 291 F. Supp. 2d 811, 816 (N.D. Ind. 2003).  As explained above, a condition that could result in permanent disablement or lingering pain is a serious medical need.  *Estelle*, 429 U.S. at 104.

The undisputed facts in this case are as follows.  Wilkerson entered the prison system with a below-the-knee amputation of this left leg.  At some point after he arrived at the East Mississippi Correctional Facility, he began complaining of pain in the stump of that leg.  Wilkerson was seen by EMCF staff and referred to Dr. Gray, an orthopedic surgeon.  Gray recommended and scheduled surgery to remove a portion of Wilkerson's fibula.  The surgery was canceled on the day before it was to be performed.  Wilkerson was also sent to Wilson Brace & Limb to be fitted for a new prosthesis, but it was never ordered.  Shortly after these two events, EMCF medical officials contacted the VA hospital about Wilkerson's condition and were told that the VA would not pay for treatment.

The evidence shows that Nurse Torgerson and Dr. Cole were well aware of Wilkerson's problems and attempted to have him successfully treated.  It is clear that neither Cole nor Torgerson had the authority to order the surgery necessary to shorten Wilkerson's amputated leg.  The evidence also shows that Cole and Torgerson notified their superiors, Warden Jagers and Dr. Johnson, of Wilkerson's situation.  Although the Defendants assert that cost was not the determinative factor in denying Wilkerson treatment for his leg, Torgerson's letter to the Warden Jagers, which was copied

12

to then-Commissioner Robert Johnson and then-Deputy Commissioner Epps particularly noted the cost of a new prosthesis and recommended that Wilkerson be transferred "to a facility that can more appropriately meet his long-term medical needs." Of course, if Wilkerson had been transferred to an MDOC-run facility, Wackenhut would not have to bear the cost of his treatment.

The evidence also shows that Commissioner Epps later attempted to intervene on Wilkerson's behalf by notifying Warden Greer of Wilkerson's medical problems, but still nothing was done. Wilkerson continued to complain about the pain in his stump, and Dr. Cole has confirmed that Wilkerson's pain was a constant issue that he treated as well as he was able. Ultimately, over two years later, and after this lawsuit was filed, the surgery was performed and a new prosthetic leg was provided to Wilkerson.

The court is of the opinion that Wilkerson is entitled to recover against certain of the Defendants in this matter. In determining which Defendants are liable, the court notes that Wackenhut Correctional Corporation was dismissed early in this action, and its successor corporation was not named as a Defendant. Because there is no direct evidence implicating Lt. Dennis Johnson, Clark Puckett, Justin Hall (who is deceased), Ron Williams, Larry Hardy, or William Ready in any decision-making process with regard to Wilkerson's treatment, they cannot be liable for his damages. Robert Johnson and Aaron Jagers were never served with process and are, therefore, not before the court. Christopher Epps made an attempt to help Wilkerson, and, while his failure to follow up on his letter was negligent, it does not constitute the sort of deliberate indifference that should result in liability. Tjwanna Torgerson and Frederick Cole treated Wilkerson with every means at their disposal. There is no evidence to show that either of them was in a position to order treatment from outside sources, nor is their any evidence that they ever denied

Wilkerson any treatment that was within their ability to supply.  Therefore, the court finds that they are likewise not liable to Wilkerson.

The same cannot be said for Glennn Johnson and Lawrence Greer.  The court finds that each of them was aware of Wilkerson's medical problems and both were deliberately indifferent to them. While Johnson's culpability may be greater, as he had authority to order Wilkerson's surgery, Greer was certainly in a position, as Warden of the facility, to instigate an investigation of the delay in Wilkerson's treatment.  The court further finds that the delay was attributable solely to cost, as Wackenhut clearly tried to shift the cost of treatment to the Department of Veterans Affairs, and, failing that, to an MDOC-operated facility.  The court finds that, although it appears that no permanent injury has occurred, Wilkerson was in pain for two and one-half years, which was only somewhat alleviated by medication.

For all of these reasons, the court holds that Wilkerson is entitled to a judgment against Greer and Johnson. In determining the amount of that judgment, the court is of the opinion that Wilkerson should be awarded the sum of $25,000.00, for the pain and suffering occasioned by Johnson and Greer's deliberate indifference in delaying his necessary surgery solely to save money, for which Johnson and Greer are jointly and severally liable.  Wilkerson is also entitled to costs and interest, as provided by law.

IT IS, THEREFORE, ORDERED that Ronald Wilkerson is entitled to a judgment against Lawrence Greer and Glenn Johnson in the sum of $25,000.00, together with costs and interest, as provided by law.  In accordance with Fed. R. Civ. P. 58(a), a separate Judgment will be entered on this date.

IT IS SO ORDERED, this the 7th day of February, 2006.


        S/Alfred G. Nicols, Jr.
_____
      UNITED STATES MAGISTRATE JUDGE